IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

      Plaintiff,

v.                                  Civil Action No. 1:13CV215
                                             (STAMP)

CONSOL ENERGY, INC. and
CONSOLIDATION COAL COMPANY,

      Defendant.


## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANTS' MOTION IN LIMINE,
## GRANTING PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION,
## AND AWARDING BACK PAY AND FRONT PAY DAMAGES

### I.  Procedural History

This action was filed by the plaintiff, the United States Equal Employment Commission ("EEOC"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. In the complaint, EEOC seeks a permanent injunction and monetary relief for the charging party, Beverly R. Butcher, Jr. ("Butcher"). EEOC alleges that the defendants, Consol Energy, Inc. ("Consol Energy") and Consolidation Coal Company ("CCC") (collectively, "the defendants"), instituted practices that denied Butcher a religious accommodation.

Prior to trial, both parties filed motions in limine. One of those motions, defendants' motion in limine to exclude evidence of lost pension benefits, is still pending. After the trial concluded, a verdict in favor of EEOC was entered and the jury

assigned only compensatory damages.  Based on this Court's previous ruling, the jury did not assign an award for other damages.

This Court then entered an order establishing a briefing schedule regarding back pay, front pay, and other damages on behalf of Butcher.   Thereafter, EEOC filed a motion for permanent injunction.  The parties submitted briefs on these issues and this Court then heard oral argument and received evidence concerning those issues.  After this hearing, this Court ordered the parties to complete supplemental briefing.

This Court is now prepared to review post-trial damages, the defendants' motion in limine, and EEOC's motion for permanent injunction.

For the reasons that follow, this Court finds that the defendants' motion in limine is DENIED and the EEOC's motion for permanent injunction is GRANTED.  Further, this Court will set out its ruling on the remaining damages to be awarded in this action.

## II.  Discussion

### A.  Monetary Damages

Awarding back pay is a discretionary function of a trial court and must be made in consideration of Title VII's objectives of deterrence and making the claimant whole.  Albemarle Paper Co., et al. v. Moody, et al., 422 U.S. 405, 418-20 (1975);  Martin v. Cavalier Hotel Corp., 48 F.3d 1343, 1358 (4th Cir. 1995).  It is also within this Court's discretion to allow a plaintiff to seek

front pay or reinstatement.  <u>Doyne v. Union Electric Company</u>, 953 F.2d 447, 448 (8th Cir. 1992).  Thus, this Court must determine if front pay should be awarded and the amount of front pay to be awarded.  <u>Id.</u> (citing <u>Duke v. Uniroyal, Inc.</u>, 928 F.2d 1413, 1424 (4th Cir. 1991).  The principles of mitigation and equity apply to such awards.  <u>Id.</u> at 451; <u>Albemarle</u>, 422 U.S. at 421.

     1.   <u>The Collateral Source Rule</u>

         a.   <u>Arguments of the Parties</u>

EEOC argues that the pension benefits that Butcher is receiving are collateral, not used for a determination of mitigation, and are not interim earnings that reduce back pay or front pay.  Further, EEOC contends that because these payments are not paid directly from and entirely by the employer, the payment from a third-party source, the United Mine Workers of America ("UMWA") Pension Fund, cannot be used in the back pay or front pay calculation.  Additionally, EEOC contends that the payments are made based on years of service in the coal industry not just for years of service with a certain employer.  Thus, EEOC asserts that the pension benefits are payments, bargained for by the UMWA, for work Butcher has already performed in the past, and not as indemnification for the employer.

The defendants argue that Butcher has not made contributions to the pension plan, the pension plan is totally employer funded, and is only administered by a third-party, and thus it is a non-

3

collateral source. The defendants cite a United States Court of Appeals for the Fourth Circuit case, Fariss v. Lynchburg Foundry, 769 F.2d 958 (4th Cir. 1985), to support their argument that Butcher's pension benefits should be considered a non-collateral source. The defendants contend that if a setoff is denied, Butcher will receive a windfall, especially since he failed to seek employment in the coal mining industry because he was receiving pension benefits. Moreover, the defendants argue that EEOC cannot lay claim to lost benefits between 2012 and 2017 with its claim that Butcher is entitled to those lost benefits in the future as well. The defendants contend that EEOC cannot claim future lost pension benefits for the same reason as it cannot claim them for back pay, the benefits are non-collateral. These same arguments are forwarded by the defendants in the remaining motion in limine.

The defendants further request in their motion in limine that this Court exclude any evidence that Butcher experienced any lost pension benefits as a result of his retirement in August 2012. Further, the defendants move to exclude any testimony of EEOC's expert witness Dr. Sovan Tun, Ph.D. ("Tun"). As background, the defendants aver that Butcher began receiving a monthly pension amount of $2,357.00 in September 2012 and if he had worked until 2017 he would have received $2,704.00 a month. Tun issued an expert report regarding lost wages which does not incorporate an offset of pension benefits. The defendants' expert, Dr. Homayoun

4

Hajiran, Ph.D. ("Hajiran"), stated in his report that Butcher will not sustain a loss of pension benefits because he retired in 2012 but will actually receive a surplus of $67,530.00. Thus, the defendants argue that Tun's testimony would lead Butcher to receive a double recovery because it does not incorporate an offset.

In response, EEOC provides Tun's testimony regarding: (1) back pay for the period of August 10, 2012 to the present; (2) front pay in the form of lost wages for the period of January 2015 until Butcher's planned retirement date of July 31, 2017; and (3) front pay in the form of lost future pension value during the period of July 31, 2017 until the end of Butcher's life expectancy; and (4) supplemental pension benefits. EEOC argues that the pension benefits that Butcher is receiving are collateral, for the same reasons as addressed above. Further, EEOC argues that the defendants are not contesting the relevancy of Tun's report but the accuracy and thus it should not be excluded.

### b. Applicable Law: Collateral Source – Generally

"The collateral source rule holds that 'compensation from a collateral source should be disregarded in assessing [ ] damages.'" Sloas v. CSX Transp. Inc., 616 F.3d 380, 389 (4th Cir. 2010) (internal citation omitted). Under the collateral source rule, an "employer-tortfeasor is not entitled to mitigate damages by setting off compensation received by the employee from an independent source . . . . The source of the funds may be determined to be

collateral or independent, even though the employer-tortfeasor supplies such funds." Haughton v. Blackships, Inc., 462 F.2d 788, 790 (5th Cir. 1972) (citing United States v. Price, 288 F.2d 448 (4th Cir. 1961); see Sloas, 616 F.3d at 390. Thus, importance should be placed on "the character of the benefit received and what such benefits were designed to do." Haughton, 462 F.2d at 790; see also Sloas, 616 F.3d at 390; Price, 288 F.2d at 450-51. If the fund from which the employee is drawing compensation is not provided to be used for liability coverage but, instead, is "in effect part of the employee's income for services rendered[,]" that fund is a collateral source. Haughton, 462 F.2d at 791; see also Sloas, 616 F.3d at 390; Price, 288 F.2d at 451. Accordingly, the main question is whether the benefit paid for by the tortfeasor was intended to respond to potential future legal liability. Sloas, 616 F.3d at 390; Phillips v. Western co. of N. America, 953 F.2d 923, 932 (5th Cir. 1992).

The United States Court of Appeals for the Fifth Circuit has applied a five prong analysis: (1) Does or has the employee made any contribution to the funding of the payment?; (2) Does the benefit plan arise as the result of a collective bargaining agreement?; (3) Does the plan and the payments cover both work-related and non-work-related injuries?; (4) Are payments from the plan contingent upon the employee's length of service?; and (5) Does the plan contain specific language contemplating a set-off of

6

benefits received under the plan against a court judgment?  <u>Id.</u>  If the answer is "yes" to all of those questions but the last, then the court should find that the source of the payment is a collateral source.  <u>Id.</u>  This analysis, although from another circuit, will be informative for this Court in applying the Fourth Circuit's "character of the benefit" rule.

c.   <u>The Pension Benefits are a Collateral Source</u>

This Court finds that Butcher's pension benefits are a collateral source.  The evidence provided by the parties shows that the pension fund is contributed to by different employers, including the defendants, who have entered collective bargaining agreements with the UMWA.  The UMWA, a third-party, then distributes those funds to the retirees.  The amount of the pension provided is based on years of employment in the coal industry at UMWA mines for work that has been completed by a certain employee.

There has been no evidence that the fund is meant to be used as an indemnifying fund for potential litigation that is not in an employer's favor.  Further, there has been no evidence that the applicable collective bargaining agreement contains a provision contemplating a set-off of benefits received in a case such as the one at hand.  In applying all of these findings to the factors cited above and Fourth Circuit precedent, this Court finds that the pension benefits are collateral and thus should not be offset.

This finding takes into consideration the <u>Fariss</u> case that was cited by the defendants. First, <u>Fariss</u> instructs that "[a] payment made entirely by the employer directly to the employee is not a 'collateral benefit' . . . ." <u>Fariss</u>, 769 F.2d at 968 n. 10. Here, the pension benefits that Butcher receives are not those paid entirely by the defendants and are not directly made to Butcher. Rather, the pension benefits Butcher receives were made by the defendants because Butcher was employed in a UMWA mine for most of his career in the mining industry and the defendants were parties to a UMWA collective bargaining agreement. If Butcher had started working at another UMWA mine, under the collective bargaining agreement, he would have received the same pension benefits upon retiring. Further, the benefits are not paid directly by the defendants but are distributed by the UMWA pursuant to the underlying collective bargaining agreement. Thus, applying the rule in <u>Fariss</u>, the benefits that Butcher has received and is receiving are a collateral source.

Second, this Court has cited <u>Sloas</u>, a case decided by the Fourth Circuit in 2010. As this case was decided after <u>Fariss</u>, this Court has given its holdings more deference given that a later decided case generally takes precedent. In sum, this Court finds that the defendants' reliance on <u>Fariss</u> does not dissuade this Court from its finding that the pension benefits are collateral.

d. <u>Supplemental Pension Benefits</u>

At the evidentiary hearing and in Tun's April 2015 report, EEOC asserted a claim for supplemental pension benefits on top of the pension benefits discussed above. EEOC stipulated at the June 18, 2015 evidentiary hearing that it had previously not included these benefits in its calculations. The defendants objected to the use of such calculations in this Court's award of damages.

These benefits are provided for under the collateral bargaining agreement similar to the pension benefits discussed above. ECF No. 158-13 at 265-73. Further, these benefits are paid by the employer based on an employee's election to have money taken out of his wage payments. <u>Id.</u> Moreover, how much an employee may elect to have contributed by the employer is based on the employee's length of service. <u>Id.</u> These payments are paid into a trustee savings plan that is administered by the UMWA and the trustees of the savings plan. <u>Id.</u>

First, this Court finds that the defendants were given enough notice to not be prejudiced by the addition of the claim for supplemental pension benefits. Tun's report was made available prior to the evidentiary hearing. Further, the complaint in this action did not specifically state what back pay or front pay it would be seeking and thus EEOC did not forego an opportunity to seek the supplemental pension benefits.

Next, this Court finds that the supplemental pension benefits are collateral. The supplemental pension benefits are based on Butcher's length of employment and are paid based on work completed by Butcher. Additionally, although paid by the employer, the funds come from the wages that would have been otherwise paid to Butcher. These funds are also administered to Butcher by a third-party. Finally, these funds are contributed pursuant to a collective bargaining agreement, there is no indication that the collective bargaining agreement requires a setoff, and the funds are not meant to be used as indemnification for any adverse judgment against the employer. All of these factors weigh in favor of finding that the supplemental pension benefits are a collateral source of funds. Accordingly, this Court will not offset those payments.

e. Motion in Limine

As this Court has found that the pension benefits are a collateral source, it must deny the defendants' motion in limine. The defendants' motion in limine requests that this Court not consider Tun's report and testimony because he did not setoff the pension benefits. However, given this Court's finding above, Tun was correct in not reducing the damages award based on Butcher's pension benefits and thus his report is relevant to a determination of damages in this action. Moreover, the use of such a calculation would not result in a windfall judgment for Butcher. Thus, the defendants' motion in limine is denied.

2.  <u>Mitigation</u>

    a.  <u>Arguments of the Parties</u>

EEOC argues that front pay and back pay are appropriate as Butcher would likely have worked at Robinson Run Mine until 2017, his projected retirement date, citing: (1) Butcher's age, (2) his years of employment with the defendants, and (3) his residence in a location that has few high-paying jobs for persons with Butcher's background. Further, EEOC contends that the relationship between Butcher and his superiors at the Harrison County Mine (formerly Robinson Run Mine) is likely irreparably damaged in this case. Finally, EEOC asserts that Butcher should not be forced to leave his current job for reinstatement with the defendants, even if it were feasible.

EEOC also argues that Butcher has mitigated his damages as he has been fully employed since October 22, 2012. EEOC avers that Butcher sought employment in the coal mining industry and in the heavy equipment operating industry as those wages would have been comparable to what he was making before. Further, EEOC asserts that the defendants do not have any proof the Butcher failed to apply for any coal industry jobs that Butcher was aware of or that there were available coal industry jobs between August 2012-October 2012. In addition, EEOC contends that under Fourth Circuit precedent, once Butcher received a lower paying job he was free to stay in that position and was not required to continue searching

for higher paying employment. Furthermore, EEOC argues that the defendants led Butcher to believe that he would not be hired by unionized mines because he was a retiree who was drawing a pension and thus Butcher's belief that he would not be hired by those mines was reasonable. Finally, EEOC asserts that there is no evidence that Butcher was aware of job openings at Federal No. 2 Mine ("Federal No. 2"), a union coal mine that had started hiring in May 2013 and at which a former acquaintance of Butcher's was involved in hiring decisions, or that Butcher would have been selected for the job had he applied.

In response, the defendants argue that Butcher failed to reasonably mitigate his back pay damages by not seeking similar employment in the coal mining industry. The defendants contend that Butcher only attended one coal industry job fair and did not thereafter seek similar employment in the coal industry because he did not want to lose his pension payments. Further, the defendants assert that Butcher would have received similar pay if he had applied with Federal No. 2 in May-August 2013 and that Butcher was likely aware of openings as his son and Donald Allard, who Butcher is personally acquainted with, work at the Federal No. 2.

b.    Applicable Law

A Title VII claimant is presumptively entitled to back pay unless the defendant provides evidence that the plaintiff did not exert reasonable efforts to mitigate his damages. Albemarle, 422

12

U.S. at 421 ("[B]ackpay should be denied only for reasons which
. . . would not frustrate the central purpose statutory purposes of
eradicating discrimination . . . and making persons whole for
injuries suffered."); City of Los Angeles, Dept. of Water and
Power, et al. v. Manhart, et al., 435 U.S. 702, 719 (1978) (stating
that the Albemarle presumption is seldom overcome).  The defendant,
however, may overcome such a presumption by offering evidence that
the claimant did not reasonably mitigate damages.  Id.  If this
Court finds that the presumption has been overcome by the evidence
offered by a defendant, deductions must be made from the claimant's
gross back pay.  Lundy, 856 F.2d at 629.

In considering whether the presumption is overcome, this Court
may give more or less weight to certain witnesses based on their
demeanor.  Id. at 1359.  In weighing such testimony, this Court
must determine whether the claimant has met his duty to be
"reasonably diligent in seeking and accepting new employment
substantially equivalent to that from which he was discharged."
Brady v. Thurstone Motor Lines, Inc., 753 F.2d 1269, 1273 (4th Cir.
1985) (citation omitted).

In determining whether a claimant accepted substantially
equivalent employment, this Court must consider the reasonableness
of the claimant's effort based on (1) the economic climate; (2) the
claimant's skill and qualifications; (3) compensation, job
responsibilities, and employment conditions of the two positions;

13

and (4) the claimant's age and personal limitations. <u>Lundy Packing Co. v. National Labor Relations Board</u>, 856 F.2d 627, 629 (4th Cir. 1988); <u>EEOC v. CTI Global Solutions, Inc.</u>, 815 F. Supp. 2d 897, 915 (D. Md. 2011). Based on those factors, a claimant may accept a lower paying job or a job in another field when his search for similar employment proves futile and the choice is made in good faith. <u>Brady</u>, 753 F.2d at 1275; <u>CTI Global Solutions</u>, 815 F. Supp. 2d at 912. Further, any refusal of substantially equivalent employment must be involuntary to avoid a setoff of damages. <u>Brady</u>, 753 F.2d at 1273. Consequently, this Court may find that when a claimant chose to stay with "steady, albeit lower paying, employment, the employee was acting reasonably in seeking a regular income." <u>Brady</u>, 753 F.2d at 1273; <u>National Labor Relations Board v. Pepsi Cola Bottling Co. of Fayetteville, Inc.</u>, 258 F.3d 305, 311 (4th Cir. 2001) (finding that lower pay by itself does not preclude full recovery).

On the other hand, this Court will not reduce the amount of back pay where the claimant took part-time or seasonal work and discontinued an otherwise reasonable job search. <u>Lundy</u>, 856 F.2d at 630. Additionally, this Court must only consider the diligence of the claimant, the "EEOC's diligence is immaterial to [the claimant's] back pay entitlement." <u>EEOC v. Massey Yardley Chrysler Plymouth, Inc.</u>, 117 F.3d 1244, 1252 (11th Cir. 1997) (where EEOC failed to request reinstatement six months prior to when the

claimant failed to request reinstatement, the court found that the six months in between would not count against the damages award).

a.  Background

Butcher testified that he attended at least three job fairs (one for Leer Mining and two in the oil and gas industry), listened for job advertisements on the radio, looked in the newspaper for job advertisements, and looked for "help wanted" signs immediately after retiring in August 2012 to October 2012.  Butcher further testified that he submitted applications for employment to a retail home improvement store; to an automobile parts store; to a temporary personnel services organization; to Leer Mining, a local, non-union coal mine; and with the Equipment Operators Union through the local union hall.  Butcher stated that he was given an interview with Leer Mining but was not offered employment.

Butcher testified that he was looking for both heavy equipment and construction jobs as well as coal mining jobs because he believed that those jobs paid as well as coal mining jobs, he had run heavy equipment at Robinson Run Mine, and had done residential and commercial construction prior to working in the coal industry. Butcher testified that he has not turned down a job offer and was not aware of other coal mining opportunities at the time other than the one he applied for with Leer Mining.

Butcher is a fifty-eight year old, whose highest level of education is a high school diploma, and who lives in a rural town

in West Virginia with his wife and two grandchildren, who he and his wife adopted. In October 2012, Butcher took a full-time hourly job as a carpenter's helper through a temporary personnel services organization making $12.00 per hour, working forty-two to forty-three hours per week. In this job, Butcher helped to put manufactured homes together; worked out of an office in Fairmont, West Virginia; and had no benefits. Butcher testified that he took this job because he was not receiving any income that could be used to support his family and he had not begun receiving his union pension benefits at this time.

Butcher was then offered permanent employment with Middletown Home Sales in January 2013 where he was still making $12.00 per hour. In September 2013, Butcher took a higher paying job with benefits with Ryan Environmental where he completed pressure washing to help clean-up environmental spills and performed some construction work. This position was full-time, generally fifty-six hours per week, and Butcher was initially paid $13.00 per hour. Butcher's hourly wage was incrementally increased through April 2015 when he was making, and to this Court's knowledge still is making, $16.50 per hour.

On the other hand, Butcher indicated that other than applying for the Leer Mining job he had otherwise not applied for other jobs in the coal mining industry. Further, Butcher testified that he had not called other companies or mines to inquire as to an opening

and did not apply with any staffing agencies for the coal industry although he was aware of agencies that fulfilled those function. Butcher testified, however, that he had learned through his experience with persons placed by these agencies at Robinson Run Mine that the benefits and pay were not comparable to what he had made at Robinson Run Mine. Butcher also stated that he did not want to take a coal mining job which would result in a loss of his pension benefits. But, Butcher indicated that he would have taken a mining job if it paid more than his pension benefits.

The defendants also put on evidence regarding Federal No. 2. Butcher testified that he was not aware the Federal No. 2 was hiring; did not call his acquaintance, Don Allard ("Allard"); or otherwise inquire into whether it was hiring. Butcher also testified that Federal No. 2 pays a lesser wage than what he had made at Robinson Run Mine and that he believed its benefit program was also sub-par to that offered through Robinson Run Mine.

A witness for the defendants, Allard (Butcher's acquaintance at Federal No. 2), testified that the wage rates are lower at Federal No. 2 than at Robinson Run Mine. However, Allard indicated that the benefits were similar until July 2013 when the parent company of Federal No. 2, Patriot Coal, filed bankruptcy and renegotiated the collective bargaining agreement with the UMWA. Allard testified that Butcher would have been qualified to apply to Federal No. 2 in May or June of 2013 and that newspaper

advertisements were placed in towns close to where Butcher resides at that time and again in February 2014.  However, Allard indicated that Federal No. 2 did not sponsor any job fairs in 2013 or 2014. Further, Allard testified that despite a second bankruptcy in 2015, Federal No. 2 has not laid off workers since 2013.

      b.  <u>Application</u>

This Court finds that Butcher has reasonably mitigated his damages.  This Court will review the four factors set forth above.

First, the economic climate of the area where Butcher resides and resided at the time he retired in 2012 was not failing but also was not strong.  The evidence provided at the evidentiary hearing shows that Butcher is from a rural area wherein high-paying employment opportunities are likely more scarce than in more populated areas.  Further, Allard's testimony provides this Court with some insight into the turbulence that has hit the coal mining industry spanning from at least 2013 to the present.  Additionally, Butcher's personal economic circumstances must be weighed.  Butcher also had a wife and two grandchildren to support at the time of his retirement and had not begun receiving any benefit payments.

The Fourth Circuit has found that an employee reasonably mitigated even though he took a lesser paying job that might generally not be considered substantially equivalent because the employee was located in a rural area where the unemployment rate was high and several employers in the area had laid off employees.

Lundy Packing Co., 856 F.2d at 629. Further, within this circuit, it has been found to be reasonable for an employee to accept part-time work after attempting to find substantially equivalent employment because of a need to support family members. CTI Global Solutions, Inc., 815 F. Supp. 2d at 912. These cases are both supportive of a finding that the economic climate in this case would afford Butcher more leeway with what job he accepted after retirement in 2012. The economic climate in his rural area was not strong and he also had the pressure of his familial responsibilities when considering what job to accept at that time. Given these factors, this Court finds that this element weighs in favor of a finding that Butcher reasonably mitigated although he took a lesser paying job that was not in the coal mining industry.

Next, Butcher testified that he only has a high school diploma and has only worked in the construction and coal mining industries. However, Butcher also testified that he is highly skilled within the coal mining industry, is a black hat,[1] and thus qualifies for numerous jobs within that industry. The qualifications and skills that Butcher acquired would likely not translate to other areas of

---

[1]A "black hat" is an experienced miner who has worked in the mines for at least one year, has passed certain certification exams, and may perform more advanced jobs than inexperienced miners referred to as "red hats." No Red Hats Allowed: Dangers of Underground Mining, The Pump Handle, Aug. 19, 2007, https://thepumphandle.wordpress.com/2007/08/19/no-red-hats-allowed-dangers-of-underground-mining/.

industry except, as Butcher testified, to the areas of heavy machinery and construction.

This element also weighs in Butcher's favor. Although skilled in certain industries, Butcher was still limited by his education in what higher-paying jobs he qualified for within his area. Thus, this factor would weigh in favor of the jobs that Butcher ultimately took which appear to be in the construction or heavy equipment industries. The jobs that Butcher ultimately accepted are not totally removed from Butcher's various skills and also are reasonable given that Butcher only has a high school diploma. See Lundy, 856 F.2d at 629 (considering the displaced employees' skill sets as mainly laborers and lack of formal education in finding that the acceptance of lower paying employment was reasonable). Thus, this factor weighs in favor of Butcher.

Thirdly, although a close call, this Court finds that the compensation, job responsibilities, and employment conditions of Butcher's position at Robinson Run Mine and the position he acquired with the temporary personnel services and Ryan Environmental qualify as reasonable mitigation. Again, Butcher may obtain employment in another field, even in a lower paying position, as long as his action was in good faith. CTI Global Solutions, Inc., 815 F. Supp. 2d at 912.

Here, Butcher took a position with the temporary personnel services at a rate of $12.00/hour and is now at a position with

Ryan Environmental at a rate of $16.50/hour.  EEOC has acknowledged that this is approximately a sixty percent lower pay rate than Butcher was making at Robinson Run Mine.  The defendants also presented evidence that there were jobs available at Federal No. 2 in May/June of 2013.  However, the evidence provided does not give a clear picture as to whether the rate of pay would have been comparable to the rate of pay Butcher received at Robinson Run Mine.  The evidence provided seems to suggest that the pay rate may have been comparable but also suggests that the pay rate could have varied by at least fifty percent (downward).  Moreover, Butcher had already secured steady employment at the time the job openings were available at Federal No. 2.  <u>Brady</u>, 753 F.2d at 1273 (claimant may stay with a lower paying job that provides regular income).  Thus, the evidence provided regarding Federal No. 2 does not provide enough for this Court to find that Butcher did not reasonably mitigate.

Butcher, however, also testified that his search did not encompass certain mining jobs because he did not want to lose his pension benefits.  Butcher explained his position, however, and stated that he would have accepted a mining job if the pay and benefits provided the same security he had with the pension benefits.  Further, Butcher's search did not completely forego a search of coal mining jobs.  Rather, Butcher attended a job fair and applied to Leer Mining.  Butcher also attended other job fairs

and put in applications in areas that he was familiar with such as heavy machinery and construction. Thus, although Butcher accepted a lower paying job, in a different field, this Court cannot find that he did not reasonably mitigate by taking that job given this Court's discretion to weigh Butcher's testimony favorably.

Other courts have held the same in cases with similar circumstances. For example, where a former employee had made weekly visits to an unemployment office and then obtained his realtor's license even though he had previously been in the trucking industry, the court found that he reasonably mitigated. Cline v. Roadway Exp., Inc., 689 F.2d 481, 489-90 (4th Cir. 1982). In this case, Butcher was even more proactive and went out to physically apply to different companies, attended job fairs, and scanned local businesses and newspapers for job announcements.

In another case, the court found that a former employee reasonably mitigated who had posted resumes online, applied to numerous positions, and attended job fairs but ultimately accepted a part-time job in order to support her family. CTI Global Solutions, Inc., 815 F. Supp. 2d at 912. This is similar to the scenario presented in this action wherein Butcher searched for jobs that he believed he was qualified for, even within the coal mining industry, but ultimately had to accept what he was offered given his familial obligations. As such, this factor also weighs in favor of Butcher receiving a full damages award.

Finally, Butcher's progressing age is a factor that weighs in favor of finding that Butcher reasonably mitigated. Butcher was nearing retirement age and had only worked in construction or in the mining industry (with heavy machinery experience as well). Thus, Butcher was limited based on his age and his limited educational background. Accordingly, this element also weighs in Butcher's favor. Consequently, this Court finds that the defendants have not met their burden of proving that Butcher did not reasonably mitigate and this Court will not make any deductions from Butcher's damages award for either back pay or front pay.

        c.   <u>Front Pay: Reinstatement</u>

This Court also finds, within its discretion, that Butcher was not required to seek reinstatement. At the evidentiary hearing, during cross-examination, Butcher testified that he would have considered reinstatement at Robinson Run Mine if that had been an option. It was then inferred that EEOC was aware that reinstatement was an option but had not informed Butcher of this option, and instead, chose to seek front pay damages.

A claimant does not need to seek reinstatement if he does not reasonably believe that the employer would rehire him. <u>Equal Employment Opportunity Commission v. Lutheran Family Services in the Carolinas</u>, 884 F. Supp. 1033, 1041 (E.D.N.C. 1994). Further, the reasonableness of a claimant's decision is based on the

knowledge and diligence of the claimant rather than of EEOC. Massey Yardley Chrysler Plymouth, 117 F.3d at 1252.

In this case, the only evidence adduced related to this matter was testimony from Butcher during the evidentiary hearing. Butcher testified that he would have returned to Robinson Run Mine if he knew that was an option. However, Butcher's testimony throughout this action indicates that he was unaware of and did not believe that reinstatement was an option. This belief, this Court finds, was reasonable given the underlying circumstances of this case. As the jury found, Butcher was constructively discharged and forced into retirement due to the failure of the defendants to accommodate his religious objection to the biometric hand scanner. It would be reasonable for Butcher to believe, given the jury's finding, that he did not have the option of reinstatement unless he was willing to use the scanner.

This finding is further made in consideration of the fact that EEOC's knowledge is not imputed to Butcher. Thus, although it was implied at the evidentiary hearing that reinstatement was an option that EEOC knew about, although it is still unclear from the testimony that this was in fact an option, this Court does not need to base its finding on the reasonableness of EEOC's decision. Rather, this Court must consider what Butcher knew and whether his decision was reasonable. Further, this Court finds that reinstatement, given the underlying circumstances, is a less

24

reasonable alternative to damages. Accordingly, this Court finds that front pay damages should be awarded given this finding and the immediately preceding finding regarding mitigation.

B.    Plaintiff's Motion for Permanent Injunction

    1.    Arguments of the Parties

In its motion for permanent injunction, EEOC requests that the Court issue a company-wide permanent injunction that will dissolve after a period of three years, which includes the following: (1) any requirement or rule for the use of a biometric hand scanner will be in conformity with Title VII as long absent undue hardship on the defendants, (2) provide complete exemption as an alternative for persons who need such an exemption as a reasonable accommodation; and (3) provide training to all management personnel regarding Title VII's requirements and the duties under the injunction within 60 days of the issuance of the injunction.

EEOC argues that such an injunction should be entered because once a plaintiff has prevailed in a Title VII case, injunctions are presumptively appropriate. Additionally, EEOC asserts that there is no requirement that the proven discrimination be ongoing, especially in a case such as this where there is a risk of future violations by the defendants as shown by the trial evidence: (1) a blanket policy for hand scanning with no policy for how to deal with religious objectors, (2) no evidence of the defendants attempting to implement a policy for dealing with religious

accommodations, and (3) all of the discriminating employees are still employed by the defendants.  Finally, EEOC argues that the injunction is narrowly tailored as it deals specifically with the biometric hand scanner and sets forth requirements of training specific to religious accommodation.

The defendants contend that an injunction is not necessary as the conduct is not ongoing and there is no blanket policy in place. The defendants again argue that key entry would have been offered to Butcher as the next step if Butcher had not made it apparent that he would not use the scanner at all.  Additionally, the defendants contend that Butcher was not given an ultimatum and still had the option of filing a grievance under the collective bargaining agreement.  Under these same collective bargaining agreement rights, it would be unlikely for such religious violations to reoccur.

Further, the defendants contend that Consol Energy should not be subjected to the injunction as (1) the jury only made a finding that it was the employer of Butcher but did not make any finding regarding its operation of other subsidiaries, (2) the matter involving Butcher was unique as no other religious objection has been received in any of the subsidiaries, and (3) there is nothing that suggests that Consol Energy makes or has made similar employment decisions at other subsidiaries.  As to CCC, the defendants argue that such an injunction should not be entered as

CCC is no longer associated with Consol Energy or the Harrison County Mine (Robinson Run Mine) because it is now owned by Murray Energy Corporation ("Murray") and its subsidiary who have implemented their own policies. Additionally, the defendants assert that an injunction is not necessary against CCC as it is under new management, policies, and procedures. Further, Chris Fazio ("Fazio") and Tom Hudson ("Hudson") are now employed by Murray Energy Corporation and its subsidiary and have no affiliation with Consol Energy. However, Sam Johnson ("Johnson") and Mike Smith ("Smith") are still employed by Consol Energy but Johnson is no longer in a human resources position and Smith is the superintendent of a mine owned by a subsidiary of Consol Energy which was not a party to this action.

As to the specificity of the injunction, the defendants argue that the injunction does not provide enough guidance as to what specifically must be done when there is a religious objection to the hand scanner. Further, the defendants contend that the injunction should take into account collective bargaining agreements and their impact on any such claims. Finally, the defendants assert that they do not contest the third prong of the injunction except as to the sixty day requirement which will likely not be enough time given the likelihood of the defendants filing appellate motions.

In reply, EEOC asserts that the defendants may not relitigate their collective bargaining agreement or blanket policy arguments at this stage in the proceedings as that has already been decided by this Court and the jury. Alternatively, EEOC argues that the collective bargaining argument fails as the defendants are simply contending that an adversarial arbitration process should be used instead of the defendants implementing a policy to avoid violations of Title VII. Additionally, EEOC contends that such a policy would not necessarily protect individual rights as the union, the gatekeeper, is interested in the rights of the group as a whole.

As to the four employees involved in the underlying action, EEOC first argues that the defendants have not shown that Johnson does not have authority over religious accommodation requests of his subordinates even though he is no longer in the human resources department. Further, EEOC contends that because Smith, Hudson, and Fazio remain in positions as supervisors or in human resources, the injunction is necessary. As to Hudson and Fazio, EEOC asserts that the defendants have not provided any indication as to what Murray's current policies are or if such policies will reduce the likelihood of future violations as the managers who committed the violation are still employed there. Additionally, EEOC asserts that the fact that no other requests have been made is immaterial as an injunction is a prophylactic measure necessary for future requests.

EEOC asserts that Consol Energy is covered by the injunction as its managers were involved in the decision making that resulted in a violation. Thus, EEOC argues that any further decision making by Consol Energy, even if it affects another subsidiary, should be covered. Finally, EEOC contends that the injunction is narrowly tailored and that it cannot provide specific guidance that would amount to legal advice. Thus, EEOC argues that the injunction must be tailored so that it may be applied in a case-by-case basis.

2. <u>Applicable Law</u>

Where a plaintiff has prevailed on a Title VII claim, there is no discretion for this court to deny injunctive relief completely. <u>United States v. Gregory, et al.</u>, 871 F.2d 1239, 1246 (4th Cir. 1989). The burden to show that injunctive relief should be curtailed is thus on the employer once a plaintiff has prevailed. <u>Equal Employment Opportunity Commission v. Service Temps, Inc.</u>, 679 F.3d 323, 338 (5th Cir. 2012). An employer must show more than curative actions after the underlying litigation was filed "to provide sufficient assurance that it will not repeat the violation to justify denying an injunction." <u>Employment Opportunity Commission v. Goodyear Aerospace Corp.</u>, 813 F.2d 1539, 1544 (9th Cir. 1987) (citation omitted). Therefore, an employer must show that the wrongful conduct was an isolated incident rather than systematic company-wide discrimination. <u>Spencer v. General Elec. Co.</u>, 894 F.2d 651, 660 (4th Cir. 1990). The burden on the employer

is a heavy one and an injunction may still be appropriate even if the employer has shown that the discriminatory conduct has ceased and no other discrimination had occurred in the past. <u>United States v. WT Grant Co.</u>, 345 U.S. 629 (1953).

Further, the EEOC is able to seek relief beyond that needed to make the claimant whole as the EEOC has the right to advocate both for the employee's personal interest and for the broader public interest. <u>Massey Yardley Chrysler</u>, 117 F.3d at 1253; <u>Goodyear Aerospace Corp.</u>, 813 F.2d at 1542 (citing <u>General Tel. Co. v. Equal Employment Opportunity Commission</u>, 446 U.S. 318, 326 (1980)). Accordingly, the existence of an arbitration agreement between the employer and the employee does not materially change the EEOC's statutory function or available remedies. <u>Equal Employment Opportunity Commission v. Waffle House, Inc.</u>, 534 U.S. 279, 280, syl. pt. (a) (2002). Moreover, an employee does not forfeit any Title VII relief by invoking the grievance and arbitration procedures under a collective bargaining agreement and thus such procedures are considered separate and apart from a Title VII claim. <u>Gen. Tel. Co.</u>, 446 U.S. at 332 (citation omitted). As such, this Court must determine the following: (1) is the violation unlikely to recur and (2) is injunctive relief needed to eliminate the discriminatory effects of the past and bar future discrimination. <u>Id.</u> Thus, "Title VII remedies have not been

limited to correcting only ongoing discriminatory policies."
Gregory, 871 F.2d at 1246.

However, the injunction must not be unreasonably difficult to comply with or to enforce and "should be no broader than necessary to achieve its desired goals." Lowery, et al. v. Circuit City Stores, et al., 158 F.3d 742, 766 (4th Cir. 1998) (citation omitted); Service Temps, Inc., 679 F.3d at 338-39. The relief must be based on the constitutional violation, must be remedial, and must be granted with consideration of its effect on the employer. Milliken v. Bradley, 433 U.S. 267 (1977). This does not, however, foreclose the possibility that the injunction will seek to enforce conduct that is already enforced by Title VII. Goodyear Aerospace Corp., 813 F.2d at 1544.

Consequently, an injunction may be tailored to do the following: (1) instruct the employer on federal law; (2) subject the employer to the contempt power of the federal courts for future violations of Title VII; (3) require the employer to establish a scheme for employees who feel they have been discriminated against to complain without backlash; (4) require the employer to take steps to establish a system where claims of discrimination are investigated and corrected; (5) require the employer to initiate a procedure for prompt hearings, adjudications, and remedying of complaints; (6) require the employer to inform any employee denied relief of his right to file a civil action; and (7) establish a

procedure for dealing with claims that will reduce the chilling effect that may occur because of employees' fear of retaliation. Id.; Bundy v. Jackson, 641 F.2d 934, 947-48 (D.C. Cir. 1981). An injunction should not, however, be put in place any longer than is necessary to ensure that a probable risk of discrimination still exists. Railway Labor Executives Ass'n v. Wheeling & Lake Erie Railroad Co., 756 F. Supp. 249, 255 (E.D. Va. 1991).

3.   Background

A jury found that the defendants discriminated against Butcher in violation of Title VII. At the evidentiary hearing, defendants' witness, Fazio, testified that he does not work for Consol Energy nor for any company that is a subsidiary of Consol Energy. Fazio testified that Robinson Run Mine has been bought by another company and is now called the Harrison County Mine. Fazio averred that except for Butcher, no other religious accommodation issues have arisen, the mine continues to operate under Title VII policies, and the mine provides training on Title VII. Further, Fazio indicated that the mine allows anonymous reporting for persons who have an accommodation issue.

Lee MeCaro ("MeCaro"), the corporate representative for Consol Energy, also testified. MeCaro testified that hourly employees must complete a new-hire orientation, an online training module, and are provided the company's equal employment opportunity statement ("EEO statement") and harassment policy. MeCaro stated

that the EEO statement was revised in 2013 and is posted on a centrally located bulletin board in each mine and on the employee intranet. MeCaro also indicated that the online program must be completed annually by supervisory employees and that it covers religious objections, accommodation, and discrimination. Further, MeCaro stated that the company has an anonymous hotline that employees may call to report discrimination. Finally, MeCaro testified that after Butcher's objection, no other religious-based objections have been received.

4. <u>Application</u>

This Court finds that a permanent injunction is required in this action and that the defendants have not met their heavy burden of proving that future discrimination will not occur. First, this Court notes that it has previously found that the grievance and arbitration procedures are not to be considered as those procedures are not considered in determining the validity of a Title VII claim. <u>See also</u> <u>Gen. Tel. Co.</u>, 446 U.S. at 332. Thus, the defendants' assertion that this Court should consider those procedures as a buffer for discrimination claims is unfounded.

Further, this Court finds that although the defendants have attempted to take curative actions after the underlying incident and the defendants report that no other incidents of discrimination have occurred, it is still a concern that all four of the employees involved are still employed by the defendants or Murray and at

least one is still employed by Consol Energy in a direct supervisory position (Smith). Additionally, the defendants assert that because other subsidiaries were not involved, the permanent injunction is not needed as CCC has been sold to Murray. However, that argument is unsupported by the actual facts of this case wherein Smith is now a superintendent at another mine-subsidiary, a scenario that needs to be covered by a prophylactic measure such as an injunction.

Moreover, this Court notes that although CCC has been sold to Murray, Murray has taken on CCC's liabilities through the acquisition. <u>See</u> Dan Zajdel, Tyler Lewis, & Lynn Seay, <u>Consol Energy Takes Transformative Step to Advance E&P Growth Strategy</u>, Consol Energy, Oct. 28, 2013, http:// www.consolenergy.com/media/22238/consol_pressrelease_102813.pdf. Thus, although Hudson and Fazio are no longer employees of Consol Energy, it appears that Murray has taken on liabilities such as those indicated in this action. Although this is not a dispositive factor, it is another indication that a permanent injunction should be applied.

Finally, this Court finds that the scope of the injunction requested by EEOC is not overly broad but does find that the final prong should be tailored to allow EEOC more time to comply with the order. The injunction specifically targets religious discrimination based on precedential case law and the biometric

hand scanning device. Further, the injunction is limited to a three year span which should allow the defendants to put in place policies and procedures, beyond what they have done now, that will ensure that all employees are reasonably accommodated for sincerely held religious beliefs. The measures prescribed later in this opinion and requested by EEOC, require the defendants to instruct its employees on federal law and also provides instructions based on federal precedent, requires the employer to establish a scheme for employees to report so that there is not a chilling effect, and requires the employer to establish procedures for prompt remedying of complaints and possible discriminatory acts in the future. Thus, all of the measures ordered in the injunction are measures that have been applied and upheld by other courts. E.g. <u>Goodyear Aerospace Corp.</u>, 813 F.2d at 1544; <u>Bundy</u>, 641 F.2d at 947-48.

However, this Court will allow 180 days instead of 60 days for compliance with the third prong of the injunction. This Court agrees with the defendants that more time is necessary in consideration of the size of Consol Energy and its workforce and the preparation that will need to be undertaken to fulfill the requirements of that prong.

C.   <u>Damages Awarded</u>

EEOC has calculated damages up to the June 18, 2015 evidentiary hearing and no party has filed another calculation based on another date. The damages calculations provided by the

defendants differ based on the arguments this Court has considered earlier in this order. Because this Court has found in favor of EEOC on those issues, it will make its findings regarding the damages award based on EEOC's calculations.

EEOC offers the following regarding back pay and front pay: (1) Butcher would have made $99,703.36 in 2012 at the Robinson Run Mine; (2) Butcher worked for $12.00/hour from October 22, 2012 to September 22, 2013; and (3) thereafter, he has been employed full-time at a rate starting at $13.00/hour when he started and now at $16.50/hour. Emerson Work, a UMWA representative, testified in deposition that Butcher would have received an additional $347.50/month in pension benefits had he retired in July or August 2017 rather than August 2012.

Tun found that Butcher was entitled to $212,395.56 for back pay from August 10, 2012 to June 18, 2015. As to front pay, Tun found that Butcher's front pay from June 19, 2015 to August 1, 2017 is $149,149.01. Further, Tun provided front pay for Butcher's lost pension, based on Butcher's life expectancy, of $60,113.48. Finally, Tun provided a calculation for lost supplemental pension benefits at a total of $15,202.69; $8,321.60 for back pay and $6,881.09 for front pay. The total amount of damages is thus $436,860.74.[2]

_____

[2]This Court notes that the final total is different than that testified to by Tun at the evidentiary hearing. This Court has totaled the numbers provided by Tun at that hearing and has found

This Court finds that these damages should be awarded based on the findings made in this opinion.

## V. Conclusion

Based on the analysis above, this Court finds that the defendants' motion in limine to exclude evidence of lost pension benefits of Beverly Butcher is DENIED. The plaintiff's motion for permanent injunction is GRANTED.

The defendants are thus ORDERED to pay back and front pay damages, which includes pension and supplemental pension benefits, in the amount of $436,860.74, with interest to be applied from the date of this order, based on the findings made in this order and based on testimony taken at the evidentiary hearing. Further, the defendants are ORDERED to pay compensatory damages in the amount of $150,000.00, as awarded by the jury on January 15, 2015 with interest to be applied from January 15, 2015. Accordingly, the total amount of monetary damages, before interest, is 586,860.74.

Further, the defendants are ORDERED to do the following, all of which will dissolve after a period of three years:

1. In relation to any requirement or rule that employees must use a biometric scanner device, the defendants shall not engage in any future violations of the provisions of Title VII of the Civil Rights Act of 1964, as amended, that require reasonable

---

that the total is as provided in this opinion rather than the total figure testified to by Tun, $437,460.74.

accommodation of religion (as defined therein) absent undue hardship on the conduct of the defendants' business;

2.   The defendants shall not maintain or implement any policy, protocol, or practice related to employee biometric scanning that in-effect excludes or categorically bars giving complete scanning exemption to employees who require such complete exemption as a reasonable accommodation for a sincere religious belief, observance, or practice that conflicts with a mandatory scanning requirement or rule; and

3.   Not later than 120 days after this order is entered, the defendants are required to provide training to all management personnel responsible for decision-making concerning religious accommodation requests that will focus on:

     a.   the meaning of "religion" as defined by Title VII of the Civil Rights Act of 1964, as amended;

     b.   an employer's duty to provide reasonable accommodation  under Title VII;

     c.   the process of bilateral cooperation between employer and employee when handling reasonable accommodation requests under Title VII;

     d.   best practices for identifying reasonable accommodations for religion and responding to employee requests for religious accommodation; and

e.    the defendants' duties under the injunction issued in this action.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.  Pursuant to Federal Rule of Civil Procedure 58, the Clerk is DIRECTED to enter judgment on this matter based upon the verdict returned by the jury on January 15, 2015, and the findings by this Court made in this memorandum opinion and order.

DATED:   August 21, 2015


                              /s/ Frederick P. Stamp, Jr.
                              FREDERICK P. STAMP, JR.
                              UNITED STATES DISTRICT JUDGE